IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY CARL DIXON,                  )
AIS #138238                        )
                                   )
        Plaintiff,                 )
                                   )
                                   )
    v.                             )        CIVIL ACTION NO. 2:07-CV-662-TFM
                                   )                    [WO]
                                   )
BAPTIST SOUTH MEDICAL              )
HOSPITAL, et al.,[1]               )
                                   )
        Defendants.                )

## MEMORANDUM OPINION

## I.  INTRODUCTION

This case is presently before the court on a 42 U.S.C. § 1983 complaint filed by

Larry Carl Dixon, a state inmate, against Baptist South Medical Hospital, Dr. Carlos M.

Gutierrez, an independent contractor serving as an emergency room physician at Baptist,

and Dr. Tai Q. Chung, an orthopedic surgeon in private practice in Montgomery, Alabama.

In the instant complaint, Dixon asserts the defendants denied him adequate medical

treatment for an injury to his left index finger suffered on August 3, 2005 at the Elmore

Correctional Facility.  Dixon seeks a declaratory judgment and monetary damages.

The defendants filed special reports, answers and supporting evidentiary materials

---

[1]Counsel for Baptist advises that the proper name for this defendant is Baptist Medical Center South. *November 2, 2007 Special Report of Baptist South Medical Hospital - Court Doc. No. 25* at 1.  In the interest of clarity, the court will henceforth refer to this defendant as it is identified by the plaintiff.

addressing Dixon's claims for relief.  Pursuant to the orders entered herein, the court deems it appropriate to treat the reports filed by the defendants as motions for summary judgment. *Order of November 6, 2007 - Court Doc. No. 29*.  Thus, this case is now pending on the defendants' motions for summary judgment.  Upon consideration of such motions, the evidentiary materials filed in support thereof and the plaintiff's response in opposition to the motions, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including

---

[2]Effective December 1, 2007, "[t]he language of Rule 56 [was] amended ... to make the rule[] more easily understood and to make style and terminology consistent throughout the rules.  These changes ... are stylistic only." Fed.R.Civ.P. 56 Advisory Committee Notes.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior rule remain equally applicable to the current rule.

pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine issue of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine issue material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial.").

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of [medical] authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted). Consequently, to survive the defendants' properly supported motions for

summary judgment, Dixon is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e)(1), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an

element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine issue of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Dixon fails to demonstrate a requisite genuine issue of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

### III. FACTS[3]

---

[3]The facts are gleaned from the pleadings filed by the parties and the undisputed medical records submitted by the defendants in support of their special reports.

On August 3, 2005, while confined at the Elmore Correctional Facility, Dixon attempted to raise the window in his living area. At this time, the window fell severing the tip of Dixon's left index finger. Correctional officers retrieved the severed portion of Dixon's finger from another inmate, placed it on ice and immediately escorted Dixon to the medical unit at neighboring Staton Correctional Facility for treatment. Prison medical personnel examined Dixon, applied a pressure dressing to slow the bleeding and advised his injury required treatment at a free-world medical facility. Correctional officials then transported Dixon to the emergency room at Baptist South Medical Hospital in Montgomery, Alabama for treatment.

Upon arrival at Baptist, Dixon completed a consent for medical services. After receiving Dixon's consent for treatment, an emergency room nurse immediately assessed Dixon's condition and deemed his triage level as urgent. Based on this assessment, medical personnel transferred Dixon to the treatment area for examination by Dr. Carlos Gutierrez. Dr. Gutierrez ordered an X-ray of Dixon's left hand to ascertain the extent of the damage to the left index finger. The X-ray demonstrated a total amputation of the tip of the left index finger. Dr. Gutierrez also evaluated the severed tip of Dixon's left index finger, which had been preserved on ice and transported with Dixon to the emergency room. This evaluation revealed severe tissue damage and profound loss of vascularization in the severed fingertip. In light of the foregoing, Dr. Gutierrez determined that re-attachment of the fingertip was not a viable option.

Dr. Gutierrez administered an anesthetic block to Dixon's left index finger, smoothed the exposed bone, covered the area with skin and applied sutures to close the wound. After completion of this procedure, Dr. Gutierrez prescribed an intravenous infusion of Ancef, an antibiotic, for infection prevention. Upon discharge, Dr. Gutierrez prescribed Cephalexin, an oral antibiotic, and Tylox for pain. He also referred Dixon to Dr. Tai Q. Chung, a board certified orthopedic surgeon, for follow-up evaluation.

On August 31, 2005, Dr. Chung examined Dixon's left index finger and noted the finger was healing in an appropriate manner. Dr. Chung removed the sutures and demonstrated to Dixon a way to desensitize the tip of his finger. Dr. Chung also determined that future revision to shorten the finger could be necessary if the fingertip remained tender.

Dr. Chung again examined Dixon on October 7, 2005. This examination took place in Dr. Chung's office. Dr. Chung noted Dixon continued to suffer moderate pain in the tip of the injured finger. His examination further revealed that Dixon's injury had healed but with mild tenderness when tapping the tip of the finger. Dr. Chung advised Dixon of sensitization exercises to lessen the tenderness.

## IV. DISCUSSION

An essential element of a 42 U.S.C. § 1983 action is that a person acting under color of state law committed the asserted constitutional deprivation. *American Manufacturers Mutual Ins. Company v. Sullivan*, 526 U.S. 40, 119 S.Ct. 977, 985, 143 L.Ed.2d 130

(1999); *Willis v. University Health Services, Inc.*, 993 F.2d 837, 840 (11ᵗʰ Cir. 1993).

> To state a [viable] claim for relief in an action brought under § 1983, [a plaintiff] must establish that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.... [T]he under-color-of-state-law element of § 1983 excludes from its reach "'merely private conduct, no matter how discriminatory or wrongful,'" *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)).... [Consequently,] state action requires ***both*** an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," ***and*** that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *see Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)."

*American Manufacturers*, 526 U.S. at 49-50, 119 S.Ct. at 985 (footnote omitted) (emphasis in original).

Both Baptist and Dr. Chung acknowledge entering into contracts with Prison Health Services, Inc., the medical care provider for the Alabama Department of Corrections at the time of the actions made the basis of the complaint, to provide health care and orthopedic services, respectively, to state inmates. *September 18, 2007 Response of Defendant Baptist Hospital - Court Doc. No. 9*; *September 24, 2007 Response of Defendant Chung - Court Doc. No. 13* at 2. Dr. Gutierrez, however, did not "enter[] into a contract with the Alabama Department of Corrections or its medical care provider, Prison Health Services, Inc., to furnish medical treatment to state inmates." *September 20, 2007 Response of Defendant*

*Gutierrez - Court Doc. No. 10.* The law is well settled that "a private physician ... under contract with a state to provide medical care to inmates 'acts under color of state law for purposes of section 1983 when undertaking his duties' to treat an inmate." *Farrow v. West*, 320 F.3d 1235, 1239 n.3 (11th Cir. 2003) (quoting *Carswell v. Bay County*, 854 F.2d 456-457 (11th Cir. 1988)); *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258 (1988) (private physician under contract with State of North Carolina to provide orthopedic services at a state prison hospital acted under color of state law for § 1983 purposes); *Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986) (private orthopedic surgeon who contracted with prison medical care provider to furnish orthopedic services to state inmates acts under color of state law when treating inmates). It likewise follows that a private hospital under contract with a state to provide medical services to inmates acts under color of state law for § 1983 purposes. *Lopez v. Dept. of Health Services*, 939 F.2d 881, 883 (9th Cir. 1991); *McKenney v. Greene Acres Manor*, 650 A.2d 699, 702 (Me. 1994). In determining whether a private physician who provides medical services to an inmate is a state actor for purposes of liability under § 1983, the Supreme Court stated that "the dispositive issue concerns the relationship among the State, the physician, and the prisoner." *West*, 487 U.S. at 56. The Court further noted that "although the provision of medical services is a function traditionally performed by private individuals, the context in which [Dr. Atkins] performs these services for the State (quite apart from the source of remuneration) distinguishes the relationship between [the physician] and West from the ordinary

10

physician-patient relationship.... [Dr. Atkins] carried out his duties at the state prison within the prison hospital. That correctional setting, specifically designed to be removed from the community, inevitably affects the exercise of professional judgment...." *Id*. at 56 n.15. In light of the foregoing, the court concludes that defendants Baptist and Chung acted under color of state law in providing medical treatment to Dixon for his injured finger.

The presence of state action is not so clear with respect to Dr. Gutierrez as neither the Eleventh Circuit nor the United States Supreme Court has directly addressed the precise nature of the relationship under *West* necessary to find state action by an emergency room physician not under contract to provide medical treatment to inmates who merely serves as an independent contractor at a hospital which has contracted to provide health care services to inmates. Although the Eleventh Circuit has not directly addressed this issue, the Court has suggested that it would require a contractual relationship with the State or a state institution to justify finding state action. *Harvey v. Harvey*, 949 F.2d 1127, 1132-1133 (11ᵗʰ Cir. 1992). In *Harvey*, the Court distinguished private physicians not under contract with a state institution from the physician in *West*, 949 F.2d at 1133 n.14, and determined that "private physicians unaffiliated with a state institution" are not state actors. *Harvey*, 949 F.2d at 1133-1134. Despite the Court's concession that an individual who is involuntarily committed is deprived of her constitutional right to liberty, it held that neither a private physician who, in accordance with state law, ordered police to take the plaintiff

into custody and transport her to a private hospital designated by the State as an emergency treatment/evaluation facility for such mental health patients nor a private physician who examined plaintiff and issued a certificate for involuntary commitment acted under color of state law as the physicians were not employed by or affiliated with the State or a state institution. *Id.*; *Estades-Negroni v. CPC Hospital San Juan Capestrano*, 412 F.3d 1, 7 (1st Cir. 2005) (footnotes omitted) (complaint filed by patient involuntarily committed against treating physicians did not allege "that any [physician] was employed by, or otherwise bound to, the state. Therefore, [plaintiff's] reliance on *West* is misplaced, *see Ellison v. Garbarino*, 48 F.3d 192, 197 (6th Cir. 1995) ('[T]he West case does not govern [because] ... [t]he present defendants are in no way contractually bound to the state.'), and her [state] employment argument fails."). The First Circuit further distinguished the facts before it from those of *West* noting that "in *West*, the defendant-physician's actions took place within a state-run prison hospital...." *Estades*, 412 F.3d at 8 n.15. In addition, private individuals are not converted to state actors merely because the State pays for their services or regulates them in some way. *West*, 487 U.S. at 56 n.15 (source of payment not dispositive of state action; rather, it is "the context in which [the physician] performs the services for the State (quite apart from the source of remuneration)" which determines the nature of the action). Moreover, utilization of security measures during the course of rendering treatment to an inmate does not transform the treatment into state action as "this conduct is really nothing more than common sense accommodation of security officers in

the proximity of a patient." *Sykes v. McPhillips*, 412 F.Supp.2d 197, 202 (N.D.N.Y. 2006).

An extensive review of decisions issued by several other federal courts indicates a split in authority on the issue of whether a private physician who treats a prisoner must be under contract with the state prison system or its medical care provider to be deemed a state actor for purposes of § 1983. The vast majority of federal courts agree that treatment by a non-contract private physician, nurse or hospital upon referral or on an emergency basis does not satisfy the requirements for state action. *Sykes*, 412 F.Supp.2d at 203-204 (private physician who contracted to provide emergency services to private hospital but did not contract with state to provide medical treatment to inmates escaped § 1983 state actor status where "physician engaged in a single encounter with a prisoner presented for emergency treatment, which he was obligated under [the Emergency Medical Treatment and Active Labor Act] to provide."); *Katorie v. Dunham*, 108 Fed.Appx. 694, 698-699 (3rd Cir. 2004) (emergency room physician "under no contract with the state" and who treated arrestee with no participation by state officials did not act under color of state law); *Styles v. McGinnis*, 28 Fed.Appx. 362, 364 (6th Cir. 2001) (private physician who provided emergency staffing services to hospital as an independent contractor and who had no contractual relationship with the state could not be considered a state actor for purposes of § 1983); *Davis v. Dorsey*, 167 F.3d 411, 412-413 (8th Cir. 1999) (concluding district court properly granted summary judgment to private hospital not under contract to provide medical care to inmates as hospital did not act under color of state law in administering

treatment to inmate); *Nunez v. Horn*, 72 F.Supp.2d 24, 27 (N.D.N.Y. 1999) (orthopedic surgeon who performed surgery at private hospital on inmate pursuant to referral but absent contract with Bureau of Prisons not a state actor); *Pino v. Higgs*, 75 F.3d 1461, 1466-1467 (10th Cir. 1996) (private emergency room physician not acting under color of state law for purposes of a § 1983 action when he examined, detained and certified plaintiff for transport under state commitment statute); *Ellison v. Garbarino*, 48 F.3d 192, 196-197 (6th Cir. 1995) (private physician "in no way contractually bound to the state" deemed not a state actor under § 1983); *but see Conner v. Donnelly*, 42 F.3d 220, 225 (4th Cir. 1994) ("We believe that the Supreme Court's analysis [in *West*] applies also to private physicians who treat state prisoners without the benefit of a contract ... the state authorizes the physician to provide medical care to the prisoner, and the prisoner has no choice but to accept the treatment offered by the physician...." Thus, the private physician "acted under color of state" when he treated the prisoner "even though he had no obligation - either through direct employment or by contractual agreement - to accept [inmate] as a patient.")[4]

As previously noted, the Eleventh Circuit has held that "private physicians unaffiliated with a state institution" and not in any way under contract with the State did not act as state actors when they admitted a patient pursuant to a Georgia involuntary

---

[4]The *Conner* court, however, expressly "distinguish[ed] the holding of the district court in *McIlwain v. Prince William Hospital*,774 F.Supp. 986, 989-90 (E.D. Va. 1991), that [private] hospital [with no contractual relationship to the State or its prison system] did not act under color of state law in treating a prisoner rushed to the hospital for emergency medical care[]" based on the fact that the hospital did not accept the constitutional obligation to treat the inmate. 42 F.3d at 228. Consequently, the decision in *McIlwain* has not been disturbed.

commitment statute. *Harvey*, 949 F.2d at 1133. However, based on Baptist's contract with the medical care provider for the state prison system, it is not axiomatic that the claims against Dr. Gutierrez fit within the reasoning of *Harvey*. This court need not decide this issue, because even assuming, *arguendo*, that Dr. Gutierrez acted under color of state law in providing emergency medical treatment to Dixon, Dixon has nonetheless failed to come forward with facts demonstrating Dr. Gutierrez or any other defendant acted with deliberate indifference to his injury.

Dixon complains the defendants violated his rights secured by the Eighth Amendment of the Constitution when they acted with deliberate indifference to the injury he suffered to his left index finger. Specifically, Dixon asserts Dr. Gutierrez "amputated plaintiff left index finger without consent," and despite "no broken bones in left hand" refused to repair the ligaments/re-attach the fingertip "due to Air medivek arrival...." *Plaintiff's Complaint - Court Doc. No. 1* at 3, 8. Dixon further contends Dr. Gutierrez and Dr. Chung "rendered substandard medical treatments" for his injured finger. *Id*. at 3. The defendants adamantly deny they acted with deliberate indifference to Dixon's injured finger and, instead, maintain they provided Dixon with all necessary and appropriate treatment for his injury. The undisputed medical records support the arguments set forth by the defendants.

Medical personnel responsible for an inmate's treatment may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's health when

these individuals know that the inmate faces "a substantial risk of serious harm" and with such knowledge disregard that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk.' *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1982-83, 128 L.Ed.2d 811 (1994). A plaintiff must also show that the constitutional violation caused his injuries." *Marsh v. Butler County*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).

In *Farmer*, the Court identified both objective and subjective elements necessary to establish an Eighth Amendment violation. With respect to the requisite objective elements, an inmate must first show "an objectively substantial risk of serious harm ... exist[ed]. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028-1029. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.... The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' ... ***[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment***." *Farmer*, 511 U.S. at 837-838 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364

(11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is ***obduracy and wantonness, not inadvertence or error in good faith***, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the named defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of

required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, ... the Supreme Court has ... emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel,* 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical

staff and the inmate as to the latter's diagnosis or course of treatment support
a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033
(citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). Moreover, "whether government

actors should have employed additional diagnostic techniques or forms of treatment 'is a

classic example of a matter for medical judgment' and therefore not an appropriate basis

for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir.

1995); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate

desires a different mode of medical treatment does not amount to deliberate indifference

violative of the Constitution); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A

difference of opinion as to how a condition should be treated does not give rise to a

constitutional violation."); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981)

(medical personnel do not violate the Eighth Amendment simply because their opinions

concerning medical treatment conflict with that of the inmate-patient).

> To be deliberately indifferent, Defendants must have been
> "subjectively aware of the substantial risk of serious harm in order to have
> had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38,
> 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321,
> 2324-25, 115 L.Ed.2d 271 (1991).... Even assuming the existence of a
> serious risk of harm and legal causation, the prison official must be aware of
> specific facts from which an inference could be drawn that a substantial risk
> of serious harm exists - and the prison official must also "draw that
> inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). "The known risk of injury must

be a strong likelihood, rather than a mere possibility before a [defendant's] failure to act

can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted). Thus, in order to survive summary judgment on his deliberate indifference claim, Dixon is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995); *Farmer*, 511 U.S. at 837-838 (To evade entry of summary judgment on a properly supported motion, plaintiff must produce sufficient evidence demonstrating (1) an objectively substantial risk of serious harm; (2) subjective awareness of this risk on the part of the defendants; (3) the defendants responded to such risk in an objectively unreasonable manner; and (4) the actions/omissions of the defendants caused his injuries); *Marsh*, 268 F.3d at 1028-1029 (same).

On August 3, 2005, Dixon severed the tip from his left index finger. Prison medical personnel evaluated Dixon and, due to the serious nature of the injury, referred him to Baptist South Medical Hospital for treatment. Upon arrival at Baptist, Dixon provided his consent for medical treatment. *Exhibit A to the Special Report of Dr. Carlos Gutierrez (Conditions of Admission and Consent for Medical Services) - Court Doc. No. 22* at 27; *Exhibit A to the Special Report of Baptist South Medical Hospital (Medical Records of Baptist South Medical Hospital for Larry Dixon - Conditions of Admission and Consent for Medical Services) - Court Doc. No. 25-2* at 13 ("I present myself for medical services at Baptist Medical South .... I consent to such care as my physician orders an[d] all other

persons caring for me deem necessary and beneficial. I understand that this care may include examinations, tests, medical and/or surgical treatment. I also understand that such treatment may involve risks and that no guarantees have been made to me about the outcome of this care. I understand that the physicians on the staff are independent contractors, and not employees or agents of Baptist Health. I understand that I have the right, in collaboration with my physician(s), to make decisions involving my health care and to accept care or to refuse treatment to the extent permitted by law and to be informed of the medical consequences of such refusal.").

After obtaining Dixon's consent for treatment, Robin Williamson, a registered nurse employed by the emergency room, assessed his condition. *Exhibit B to the Special Report of Baptist South Medical Hospital (Affidavit of Nurse Robin Williamson) - Court Doc. No. 25-3* at 1. Nurse Williamson noted Dixon suffered mild distress, appeared alert and oriented but experienced slurred speech. *Exhibit A to the Special Report of Baptist South Medical Hospital (Medical Records of Baptist South Medical Hospital for Larry Dixon) - Court Doc. No. 25-2* at 4. The nurse assigned an "urgent" triage level and then transferred Dixon to the treatment area at which time Dr. Gutierrez examined Dixon. Dr. Gutierrez ordered an X-ray of Dixon's left hand which demonstrated "amputation at level of the mid portion of the distal phalange of the index finger. There is a comminuted fracture of the residual distal phalange." *Id*. at 12. Evaluation of the severed portion of Dixon's finger revealed severe tissue damage and loss of vascular function in the tissue such that re-

attachment of the fingertip was not, in Dr. Gutierrez's medical opinion, a practicable treatment option. *Exhibit B to the Special Report of Dr. Carlos Gutierrez (Affidavit of Carlos Gutierrez) - Court Doc. No. 22* at 31.

Dr. Gutierrez addresses Dixon's claims as follows:

.... On August 3, 2005, Mr. Dixon presented to the emergency room at Baptist Medical Center South with a severe laceration to his left index finger. X-ray evaluation determined that Mr. Dixon had an amputation at the level of the mid portion of the distal phalange with a comminuted fracture at the residual distal phalange. I evaluated the amputated portion of Mr. Dixon's finger (which had been preserved on ice) and determined that reattachment of the tissue was contraindicated due to the severity of the damage and loss of vascularization.

In order to treat Mr. Dixon's open wound, I administered an anesthetic block and rongeured the exposed bone. I subsequently cleansed the wound and used a running suture to close the remaining skin flap. Mr. Dixon tolerated the procedure well. Mr. Dixon's finger was dressed with adaptic and bulky kerlix roll and a protective aluminum splint was used to stabilize the dressing. Ancef (an antibiotic) was prescribed to retard infection.

M. Dixon ... was discharged on August 4, 2005. At discharge, Mr. Dixon was prescribed Cephalexin (an antibiotic) and Tylox for pain. He was provided a referral to Dr. Tai O. Chung, an orthopedic specialist, for follow-up evaluation. Mr. Dixon consented to receive the medical treatment described above.

It is my understanding that Mr. Dixon has alleged that I failed to repair unspecified finger ligaments due to time constraints associated with a "Air medivek" [allegedly arriving at the hospital at the time of his evaluation]. This allegation is untrue as I ... treated Mr. Dixon's amputated finger in an appropriate and timely manner. Mr. Dixon also claims that [my] treatment of his left finger would was contraindicated based upon his belief that there were no broken bones in his left hand. This allegation is also untrue, as Mr. Dixon's x-ray evaluation clearly showed the existence of a comminuted fracture.

Based on my review of Mr. Dixon's medical records, and on my personal knowledge of the treatment provided to him, it is my opinion that his medical conditions and complaints have been evaluated and treated in a

timely and appropriate fashion. At all times, I have exercised the same degree of care, skill, and diligence as other similarly situated health care providers would have exercised under the same or similar circumstances. In other words, it is my opinion that the appropriate standard of care has been adhered to at all times in providing medical care, evaluation, and treatment to this inmate.

At no time have I denied Mr. Dixon any needed medical treatment, nor have I ever acted with deliberate indifference to any serious medical need of Mr. Dixon. At all times, Mr. Dixon's medical complaints and conditions have been addressed as promptly as possible under the circumstances.

*Exhibit B to the Special Report of Dr. Carlos Gutierrez (Affidavit of Carlos Gutierrez) - Court Doc. No. 22* at 30-32; *Exhibit C to the Special Report of Baptist South Medical Hospital (Affidavit of Registered Nurse Sam Mayercik, Director of Emergency/Trauma Services at Baptist) - Court Doc. No. 25-2* at 3 ("At 10:25 p.m., a hand tray was requested from surgery and delivered to the emergency room. An x-ray was done at 10:30 p.m. of the left hand which showed 'fracture amputation distal phalange index finger.' Dr. Gutierrez notes in the record that the x-rays, as interpreted by him and discussed with the radiologist, showed a complete amputation of the left index finger.... In summary, the tip of ... Dixon's left index finger was amputated prior to his arrival at the emergency room due to [a falling window], and the bone was exposed. Dr. Gutierrez 'deadened' Dixon's hand by giving him a digital block consisting of 6 cc's of Narcain .5%. Dr. Gutierrez then smoothed out the exposed bone and covered it with skin.... After the amputation was completed by Dr. Gutierrez, an intravenous infusion of Ancef was given to Dixon at 12:05 a.m. Ancef is a medication given as prevention for infection.....*"); *Exhibit A to the Special*

*Report of Dr. Carlos Gutierrez (Medical Records of Baptist South Medical Hospital for*

*Larry Dixon) - Court Doc. No. 22* at 12-32 (same).

Pursuant to the referral furnished by Dr. Gutierrez, correctional officials transported

Dixon to a follow-up appointment with Dr. Tai Q. Chung.

> On August 31, 2005, I saw Larry Dixon in my office. The tip of his left index finger had been amputated by a window on August 3, 2005. Mr. Dixon's amputation had been repaired at Baptist South Emergency Room. He complained [to me] of some tenderness at the amputation tip at that time. The wounds appeared to be healing well. He had previously placed sutures. He had some tenderness on palpitation at the tip of his finger. He could wiggle the tip of the finger. He had some decreased sensation to light touch at the tip of his finger. At that time, I removed his sutures and showed Mr. Dixon how to desensitize the tip by lightly tapping on the area on a soft surface. I determined that if the tip of his finger remained tender, he may require revision to shorten the length to give him better soft tissue coverage. Mr. Dixon was to return to see me as needed.
>
> I saw Mr. Dixon again on October 7, 2005 for an office visit. Mr. Dixon still had some pain. My examination revealed that his wound had healed, but with some tenderness on tapping at the tip of his finger. I discussed sensitization exercises with him and ordered that he was to return to see me as needed.
>
> The medical services I provided to Mr. Dixon met the applicable standard of care for orthopaedic medical care. At all times, I provided medical services to Mr. Dixon which met or exceeded the applicable standard of care....

*Exhibit 1 to the Special Report of Dr. Tai Q. Chung (Affidavit of Tai Q. Chung) - Court*

*Doc. No. 26-2* at 2.

Under the circumstances of this case, it is clear that the course of treatment

undertaken by the defendants was neither grossly incompetent nor inadequate. Although

Dixon asserts Dr. Gutierrez should have attempted to re-attach his fingertip, this assertion,

without more, fails to establish deliberate indifference. *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment); *Adams*, 61 F.3d at 1545 (whether medical personnel "should have employed additional ... forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment."). It is undisputed that Dixon received significant medical treatment from various medical professionals as dictated by the severity of the injury to his finger. Based on well settled law referenced herein, his mere desire for a different mode of medical treatment does not amount to deliberate indifference. Dixon has failed to present any evidence which indicates the defendants knew that the manner in which they treated his injury created a substantial risk to his health and that with this knowledge consciously disregarded such risk. The record is devoid of evidence, significantly probative or otherwise, showing that the defendants acted with deliberate indifference to Dixon's medical needs. Summary judgment is therefore due to be granted in favor of the defendants.

A separate order will accompany this memorandum opinion.

Done this 1st day of February, 2010.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE